THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. _____

MARTIN FURNITURE AND BEDDING, INC.,  )
on behalf of themselves and all others similarly  )
situated,  )
                                 )
       Plaintiff,  )
                                 )
v.  )
                                 )
FXI – FOAMEX INNOVATIONS, INC.;  )
CARPENTER COMPANY; CARPENTER  )          **COMPLAINT**
CANADA CO.; E.R. CARPENTER, L.P.;  )    **(Jury Trial Demanded)**
DOMFOAM INTERNATIONAL, INC.;  )
VALLE FOAM INDUSTRIES, INC.; OHIO  )
DECORATIVE PRODUCTS, INC.; FLEXIBLE  )
FOAM PRODUCTS, INC.; FUTURE FOAM,  )
INC.; HICKORY SPRINGS MANUFACTURING  )
COMPANY; INOAC CORP.; INOAC USA INC.;  )
CREST FOAM INDUSTRIES INC.; LEGGETT  )
& PLATT INC.; MOHAWK  INDUSTRIES,  )
INC.; OTTO BOCK POLYURETHANE  )
TECHNOLOGIES, INC.; PLASTOMER CORP.;  )
SCOTTDEL, INC.; VITAFOAM PRODUCTS  )
CANADA LIMITED; VITAFOAM, INC.; THE  )
WOODBRIDGE GROUP; and WOODBRIDGE  )
FOAM FABRICATING, INC.,  )
                                 )
       Defendants.  )
_____)

      Plaintiff Martin Furniture and Bedding, Inc., individually and on behalf of a proposed

class of all those similarly situated, brings this action for damages and injunctive relief under the

antitrust laws of the United States against Defendants FXI – Foamex Innovations, Inc.; Carpenter

Company; Carpenter Canada Co.; E.R. Carpenter, L.P.; Domfoam International, Inc.; Valle

Foam Industries, Inc.; Ohio Decorative Products, Inc.; Flexible Foam Products, Inc; Future

Foam, Inc.; Hickory Springs Manufacturing Company; Inoac Corporation; Inoac USA Inc.; Crest Foam Industries Incorporated; Leggett & Platt Incorporated; Mohawk Industries, Inc.; Otto Bock Polyurethane Technologies, Inc.; Plastomer Corporation; Scottdel, Inc.; Vitafoam Products Canada Limited; Vitafoam, Inc.; The Woodbridge Group; and Woodbridge Foam Fabricating, Inc., and hereby demand trial by jury.

Based upon personal knowledge, information and belief, and the investigation of counsel, Plaintiff alleges as follows:

## INTRODUCTION

1.      This case arises out of a conspiracy among Defendants and their co-conspirators with the purpose and effect of fixing prices of polyurethane foam.  From January 1, 1979 through the present, and earlier, Defendants contracted, combined or conspired to fix, raise, maintain or stabilize prices and allocate customers for polyurethane foam in the United States, the purpose and effect of which was to maintain supracompetitive prices, by the means and mechanisms described herein.  As a result of Defendants' unlawful conduct, Plaintiff and members of the proposed class paid higher prices for polyurethane foam than they would—and should—have paid in a competitive market.

2.      As set forth below, the conspiracy is reflected in specific and detailed communications between and among executives and employees of Defendants and their co-conspirators who have communicated with one another to fix prices and allocate customers.

3.      This case is brought on behalf of a Class (defined below) comprising all persons who purchased polyurethane foam directly from one or more of the Defendants or their co-conspirators between January 1, 1979 and the date of class certification ("Class Period"), exclusive of Defendants and their co-conspirators.

4.      As discussed in greater detail below, Defendants explicitly agreed with each other to charge inflated prices for polyurethane foam.  Every price increase known during the Class Period was the result of conspiratorial and anti-competitive discussions among Defendants to fix prices.  Defendants also engaged in a combination and conspiracy among themselves to allocate customers in specific communications between each other.

5.      As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, Plaintiff and the other Class members have paid more during the Class Period for polyurethane foam than they otherwise would have paid in a competitive market and, therefore, have been injured in their respective businesses and property.

6.      Plaintiff has been a direct purchaser of polyurethane foam from one or more of the Defendants during the Class Period.  Plaintiff brings this lawsuit as a class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees, to enjoin Defendants' anticompetitive conduct, and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PLAINTIFF

7.      Plaintiff Martin Furniture and Bedding, Inc. ("MFB") is a Minnesota corporation with its principal place of business located at 437 Atwater Street, St. Paul, Minnesota 55117.  During the Class Period, MFB purchased polyurethane foam directly from one or more of the Defendants and paid higher prices than it would have paid in the absence of Defendants' unlawful conduct.

8.      MFB purchased over a million dollars of polyurethane foam directly from one or more of the Defendants during the Class Period and, as a result of Defendants' unlawful conduct, suffered the type of injury which the antitrust laws are intended to prevent and remedy.

## DEFENDANTS

### A.      Foamex

9.      Defendant FXI - Foamex Innovations, Inc. (f/k/a Foamex International, Inc.) ("Foamex") is a privately owned and operated company with its headquarters located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063-2076.  According to its website, Foamex is a leading producer of polyurethane foam for the "Home, Healthcare, Electronics, Industrial, Personal Care and Transportation Markets"; its polyurethane foam is used by the automotive, shipping, furniture and electronics industries as well as "critical components for filters, dispensers, gaskets and seals" in a variety of products.[1] It has plant locations in the following U.S. locations: Albuquerque, New Mexico; Auburn, Indiana; Cornelius, North Carolina; Compton, California; Corry, Pennsylvania; Denver, Colorado; East Rutherford, New Jersey; Fort Wayne, Indiana; Houston, Texas; Kent, Washington; Morristown, Tennessee; Omaha, Nebraska; Orange, California; Portland, Oregon; San Leandro, California; Santa Teresa, New Mexico; and Tupelo, Mississippi.[2] During the Class Period, Foamex sold polyurethane foam throughout the United States.

### B.      Carpenter

10.      Defendant Carpenter Company (f/k/a E.R. Carpenter Company, Incorporated) ("Carpenter Co.") is a Virginia corporation with its headquarters located at 5016 Monument Avenue, Richmond, Virginia 23230.  According to its website, "Carpenter Co. is the largest

---

[1] <http://www.fxi.com/html/01_company.php>
[2] < http://www.fxi.com/html/01_locations.php>

manufacturer of polyurethane foam cushioning in the world" and it "manufacture[s] a wide variety of polyurethane foam," including for bedding, carpet cushion, flexible foam packaging, furniture, and molded manufacturing, among other products.[3]   During the Class Period, Carpenter Co., directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

11.   Defendant Carpenter Canada Co. (f/k/a Carpenter Canada Ltd. and E. R. Carpenter Company of Canada Limited) ("Carpenter Canada") is a Canadian corporation with its principal place of business located at 5016 Monument Avenue, Richmond, Virginia 23230. During the Class Period, Carpenter Canada, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

12.   E. R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("E. R. Carpenter") is a Virginia limited partnership with its principal place of business located at 5016 Monument Avenue, Richmond, Virginia 23230.   During the Class Period, E. R. Carpenter, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

13.   Carpenter Co., Carpenter Canada and E.R. Carpenter are collectively referred to herein as "Carpenter."

C.   **Domfoam/Valle Foam**

14.   Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Boulevard, Montreal, Quebec, H1P 2C, Canada.   According to its website, "Domfoam has grown to be Canada's leading and most diversified manufacturer of ether, ester, rebounded flexible polyurethane foams and visco elastic foam" and it "services the demanding urethane market in Canada and in the USA by

---

[3] <http://www.carpenter.com/>

meeting the toughest industry standards and requirements."[4]  Domfoam sells, among other things, the following polyurethane foam products:  mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, antistatic foam, anti-microbial foam, visco-elastic foam, camping foam and sporting goods.  During the Class Period, Domfoam sold polyurethane foam throughout the United States.

15.  Defendant Valle Foam Industries, Inc. ("Valle") is a Canadian corporation with its headquarters located at 4 West Drive, Brampton, Ontario L6T 2H7, Canada.  According to a press release from the Ontario BioAuto Council, Valle "manufactures slab stock polyurethane foams for the furniture, bedding, packaging, carpet and children's toy industries."[5]  During the Class Period, Valle, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

D.  **The Flexible Foam Defendants**

16.  Defendant Ohio Decorative Products, Inc. ("Ohio Decorative") is a private corporation with its principal place of business located at 220 S. Elizabeth Street, Spencerville, Ohio 45887.  Ohio Decorative is the parent company of Defendant Flexible Foam Products, Inc.  According to its website, Ohio Decorative "develop[s] and distribute[s] an exceptionally broad range of foam and foam components for an equally substantial range of industries."[6]  During the Class Period, Ohio Decorative, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

17.  Defendant Flexible Foam Products, Inc. ("Flexible Foam Products") is an Ohio corporation with its principal place of business located at 220 S. Elizabeth Street, Spencerville, Ohio 45887.  It is a subsidiary of Ohio Decorative and has operations in Texas, Indiana, Florida

---

[4] <http://www.domfoam.com/WEB%20domfoam%20avec%20a-z/company-head.htm>
[5] <http://www.bioautocouncil.com/investments.aspx>
[6] < http://flexiblefoam.com/About/Default.aspx>

and Wisconsin. According to its website, Flexible Foam Products "is one of the world's largest suppliers of polyurethane foam…provid[ing] the best product at the best price possible for the customer."[7] During the Class Period, Flexible Foam Products, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

18. Ohio Decorative and Flexible Foam Products are collectively referred to herein as "Flexible Foam."

### E. Future Foam

19. Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located at 1610 Avenue N, Council Bluffs, Iowa 51501. According to its website, Future Foam "began producing foam in 1958 for the furniture industry," but "[t]oday [it] produce[s] foam at five strategically located foam pouring and carpet cushion plants as well as fifteen fabrication plants."[8] Future Foam produces foam products for bedding, foam blocks, carpet cushion, furniture and packaging.[9] During the Class Period, Future Foam sold polyurethane foam throughout the United States.

### F. Hickory Springs

20. Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 Second Avenue, NW, Hickory, North Carolina 28603 and facilities in Tennessee, among other locations. According to the "Foam Products" section of its website, "Hickory Springs is one of the largest producers of flexible polyurethane in the world. From numerous locations across the country, Hickory Springs provides more than 160 formulations of foam for use in furniture, beddings, medical,

---

[7] <http://flexiblefoam.com/About/CompanyOverview.aspx>
[8] < http://www.futurefoam.com/>
[9] <http://futurefoam.com/products.asp>

Case 5:10-cv-00178-RLV   Document 1   Filed 11/15/10   Page 7 of 40

and packaging, novelty and industrial applications."[10]  During the Class Period, Hickory Springs, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

### G.    The Inoac Defendants

21.    Defendant Inoac Corporation ("Inoac Corp.") is a Japanese company with its principal place of business at 450-0003 2-13-4 Meieki Minami, Nakamura-ku, Nagoya, Aichi, Japan.  According to its website, "[i]n 1954, INOAC firstly introduced polyurethane foam to Japan and has continued to pioneer new foam products and processing technologies."[11]  It makes polyurethane foam for, among other things, "Furniture, Bedding, and Cushions."[12]  During the Class Period, Inoac Corp., directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

22.    Defendant Inoac USA Inc. ("Inoac USA") is a private corporation with its principal place of business at 901 ½ Nutter Drive, Bardstown, Kentucky 40004.  It is the parent company of Defendant Crest Foam Industries Inc.  Inoac USA, on the other hand, operates as a subsidiary of Inoac Corp. which lists Inoac USA on its website as part of its overseas network engaged in "Foam Products Fabrication Sales."[13]  During the Class Period, Inoac USA directly or through its subsidiaries, affiliates, predecessors-in-interest, and assigns, sold polyurethane foam throughout the United States.

23.    Defendant Crest Foam Industries Inc. ("Crest") is a Delaware corporation with its principal place of business at 100 Carol Place, Moonachie, New Jersey 07074.  Crest, a wholly owned subsidiary of Inoac USA, was formerly a joint venture between The Vita Group UK and

---

[10] < http://www.hickorysprings.com/2008/Foam.html>
[11] < http://www.inoac.co.jp/fpd/en/guide/index.html>.
[12] <http://www.inoac.co.jp/fpd/en/function/cushion/index.html>
[13] <http://www.inoac.co.jp/fpd/en/network/global/index.html>

Inoac Corp. During the Class Period, Crest, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

24.     Inoac Corp., Inoac USA and Crest are collectively referred to herein as "Inoac."

**H.     Leggett & Platt**

25.     Defendant Leggett & Platt Incorporated ("Leggett") is a Missouri corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836. Leggett manufactures, among other things, foam and other components for the bedding and furniture industry.[14] During the Class Period, Leggett sold polyurethane foam throughout the United States.

**I.     Mohawk**

26.     Defendant Mohawk Industries, Inc. ("Mohawk") is a Delaware corporation with its headquarters located at 160 S. Industrial Boulevard, Calhoun, Georgia 30701. During the Class Period, Mohawk, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

**J.     Otto Bock**

27.     Defendant Otto Bock Polyurethane Technologies, Inc. ("Otto Bock Polyurethane") is a private company with its principal place of business located at 3 Penn Center West, Suite 406, Pittsburgh, Pennsylvania 15205. It is a division or subsidiary of Otto Bock Schaumstoffwerke GmbH, a German company with its principal place of business located at Max-Naeder-Street 15, 37115 Duderstadt, Germany, whose slogan is "Best in Foam."[15] During the Class Period, Otto Bock Polyurethane sold polyurethane foam throughout the United States.

---

[14] <http://www.leggett.com/residential-furnishings.htm>
[15] < http://www.ottobock-kunststoff.de/en/slabstockfoam.php>

**K.** **Plastomer**

28.     Defendant Plastomer Corporation ("Plastomer") is a private company with its principal place of business located at 37819 Schoolcraft Road, Livonia, Michigan 48150. Plastomer, which describes itself as "the recognized Pioneer in Flexible Foam products for manufacturing industries in North America and the World," produces and sells flexible polyurethane foam primarily for the automotive industry.[16]  During the Class Period, Plastomer sold polyurethane foam throughout the United States.

**L.** **Scottdel**

29.     Defendant Scottdel Inc. ("Scottdel") is an Ohio corporation with its principal place of business located at 400 Church Street, Swanton, Ohio 43558.  According to its website, "Scottdel began manufacturing bonded urethane carpet cushion in 1961," and the company "manufactures a complete line of commercial and residential bonded urethane cushions," and it "deliver[s] cushion on [its] own fleet of trucks in a 14 state area from Minneapolis to Baltimore," or it can be "shipped in less than truckload quantities nationwide."[17]  During the Class Period, Scottdel sold polyurethane foam throughout the United States.

**M.** **The Vitafoam Defendants**

30.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its principal place of business located at 150 Toro Road, North York, Ontario M3J 2A9, Canada.  According to its website, Vitafoam Canada "manufactures all types of flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory

---

[16] <http://www.plastomer.com/company.asp>
[17] <http://www.scottdel.com/html/about.html>

foams…[and] latex mattresses and toppers."[18]   During the Class Period, Vitafoam Canada, directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

31.     Vitafoam, Inc. ("Vitafoam U.S.") is a privately owned and operated company with its principal place of business located at 2215 Shore Drive, High Point, North Carolina 27263.  According to its company profile on LinkedIn.com, "The company offers polyurethane foam products for packaging, furniture, and upholstery industries; marine industry products, … foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry."[19]   During the Class Period, Vitafoam U.S., directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

32.     Vitafoam Canada and Vitafoam U.S. are collectively referred to herein as "Vitafoam."

N.      **The Woodbridge Defendants**

33.     Defendant The Woodbridge Group ("Woodbridge Group") is a Canadian corporation with its principal place of business located at 4240 Sherwoodtowne Boulevard, Mississauga, Ontario, L4Z 2G6, Canada.  According to its website, Woodbridge Group is well known for automotive solutions but also "supplies a growing list of diverse sectors including: Commercial and Recreational Transportation, Building Products, Construction, Packaging and several consumer and industrial markets."[20]   Woodbridge Group has a global partnership with Inoac Corp. called the "World Polyurethane Alliance."  During the Class Period, Woodbridge,

---

[18] <http://www.vitafoam.ca/>
[19] <http://www.linkedin.com/companies/vitafoam>
[20] <http://www.woodbridgegroup.com/aboutus/aboutus_capa.html>

directly or through its subsidiaries, affiliates, predecessors-in-interest and assigns, sold polyurethane foam throughout the United States.

34.      Defendant Woodbridge Foam Fabricating, Inc. ("WFFI") is a private company with its principal place of business located at 1120 Judd Road, Chattanooga, Tennessee 37406. WFFI is a joint venture between Woodbridge Group and Inoac Corp, the latter of which lists WFFI on its website as part of its overseas network engaged in "Polyurethane Foam Manufacturing, Sales."[21]   During the Class period, WFFI, directly or through its subsidiaries, affiliates, predecessors-in-interest, and assigns, sold polyurethane foam throughout the United States.

35.      Defendants Woodbridge Group and WFFI are collectively referred to herein as "Woodbridge."

<u>**AGENTS AND CO-CONSPIRATORS**</u>

36.      The acts alleged against Defendants in this Complaint were authorized, ordered or performed by their officers, agents, employees or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

37.      Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

38.      Each Defendant acted as the principal, agent or joint venturer of, or for, other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiff.

---

[21] <http://www.inoac.co.jp/fpd/en/network/global/index.html>

## JURISDICTION AND VENUE

39.     Jurisdiction is conferred upon this District pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

40.     Venue is proper in this District pursuant to 28 U.S.C. §§ 15, 22 and 26 and pursuant to 28 U.S.C. § 1391(b)-(d) because, at all times relevant to the Complaint, Defendants transacted business, were found or acted through subsidiaries or agents present in this District. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District. The unlawful acts complained of herein have had, and will continue to have, substantial anti-competitive effects within this District.

41.     This Court has *in personam* jurisdiction over each of the Defendants because, among other things, each of the Defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this District and directed the unlawful conspiracy through persons and entities located in this District, including fixing the prices of polyurethane foam sold to purchasers in this District; (b) transacted business in polyurethane foam and other products in this District; (c) maintains, and has maintained, continuous and systemic contacts with this District over a period of years; and (d) purposefully availed itself of the benefits of doing business in this District. Accordingly, each of the Defendants maintains minimum contacts with this District more than sufficient to subject it to service of process and sufficient to comply with due process of law.

Case 5:10-cv-00178-RLV   Document 1   Filed 11/15/10   Page 13 of 40

# FACTUAL ALLEGATIONS

## A.    The Polyurethane Foam Market

42.    The term "polyurethane foam" refers to various types of foam-related products consisting of polymers made of molecular chains bound together by urethane links.  There are four basic categories of polyurethane foam: flexible, rigid, microcellular and elastomeric.  All polyurethane foam, however, is made using the same basic process—i.e., a polymerization reaction involving a diol or polyol, a diisocyanate and water.  Manufacturers may, however, add catalysts or surfactants to boost reactions and control the foaming process, while certain additives such as dyes, stabilizers, fire retardants and fungicides may be used to meet specific performance needs.

43.    Polyurethane foams are typically used to insulate objects and reduce shock.  Thus, it has a wide rage of applications, including: furniture and furnishings (e.g., cushion padding, pillows, mattresses and quilt rolls); transportation products (e.g., automotive seat cushions, dashboard padding and noise insulation for cabins); building and construction (e.g., carpet cushioning, sound control, building insulation, custom architectural shapes and concrete voids); packaging material (e.g., shipping pads and food containers); athletic equipment (e.g., running shoes, helmets and surfboards); and filtration media, among other uses.

44.    According to CHEMICAL & ENGINEERING NEWS, flexible polyurethane foam is found in sofas and mattresses, while rigid polyurethane foams are used for building insulation and to repair cracks in buildings.  These two types make up most of the polyurethane foam market, but there are two other types: "microcellular foam, which may be used to make car

steering wheels or line the insides of athletic helmets, and elastomeric foam, which is typically used to make the outer sole of many types of footwear, including athletic shoes."[22]

45.     "Flexible foams have mainly open cells, formed by gas bubbles that have popped. Air can pass through the foam easily, resulting in a soft, resilient, flexible material.  In rigid foams, most of the cells stay closed.  The material is thus harder and less resilient.  Controlling the proportion of open cells to closed cells during the production process is one of the ways that the properties of foam can be manipulated, adding to the material's versatility."[23]

46.     According to the PFA, flexible polyurethane foam ("FPF") "is widely used for its qualities: it is light weight, resilient, quiet, low odor and resistant to mildew and other triggers of common allergies.  FPF may also be molded and cut ….  More than 1.2 billion pounds of foam are produced and used every year in the U.S."[24]

47.     Rigid polyurethane foam is commonly used in construction.  According to the Center for Polyurethanes Industry, it "has unique insulating properties that make it ideal for walls and roofs" because of its "remarkably strong, yet lightweight, low-density structure that is both dimensionally stable and moisture-resistant with low vapor transmission."  It is commonly used for insulation, and when sprayed, it "provides weatherproof sealants, forms a seamless layer of insulation, and fills gaps and seams during application and covers irregular, hard-to-insulate shapes."[25]

48.     In 2010, domestic revenue for the polyurethane foam industry is expected to be approximately $12 billion.

---

[22] Linda Wang, *Polyurethane Foam*, CHEMICAL & ENGINEERING NEWS, 84:2, 48 (Jan. 9, 2006).
[23] Wang, *supra* n.17.
[24] PFA, *Flexible Polyurethane Foam: Industry at a Glance*, available at http://www.pfa.org/Library/IAG_no_logo.pdf
[25] Center for the Polyurethanes Industry - Building & Construction, <http://www.polyurethane.org/s_api/sec.asp?CID=913&DID=3626>.

**B.** **Market Factors Supporting the Existence of the Conspiracy**

49.     Various market factors make the polyurethane foam market susceptible to anticompetitive practices and unlawful collusion.

### i.     Significant Barriers to Entry

50.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

51.     There are significant barriers to entry in the polyurethane foam market.  Entry requires, among other things, that a company incur significant start-up capital expenditures, including those needed for manufacturing facilities, and significant investment in a distribution network.

52.     Existing manufacturers have established relationships with upstream suppliers and downstream purchasers, and can negotiate prices for raw materials and term contracts with major customers.  Without these contacts, new entrants would face significant hurdles to afford inputs and secure customers.

53.     The industry has been consolidating rather than attracting new entrants.  In recent years, major players within this industry have been active in acquiring smaller companies and other competitors. For example:

- In 2005, Ohio Decorative acquired Nu-Foam;

- In 2007, Carpenter acquired its European competitor Dumo NV; and

- In 2006, following the purchase of its parent corporation, Vitafoam U.S. sold one of its plants to Olympic Products LLC, a joint venture between Woodbridge and Hickory Springs, and another plant to Flexible Foam Products.[26]

### ii. Inelastic Demand Due to Lack of Substitutes

54.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

55.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchase substitute products or decline to buy altogether.

56.     Demand for polyurethane foam is relatively inelastic. According to the PFA: "In furniture and bedding applications, short staple polyester fiber is often used instead of [flexible polyurethane foam], as is cotton, but both alternative materials have poor height recovery characteristics after compression. Steel springs also recover well but must be insulated from the user with some type of cushioning material. Comparing [flexible polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute."[27]

57.     Defendants alleged here to be participants in the conspiracy represent a significant portion of the United States polyurethane foam market. Because of the prohibitive freight costs

---

[26] Michelle Rash, *Buyout leads foam firm to sell two Triad plants*, THE BUSINESS JOURNAL, Feb. 17, 2006, available at <http://www.bizjournals.com/triad/stories/2006/02/20/story8.html>.
[27] <http://www.pfa.org/faq.html>

associated with transporting the low-cost, bulky material, imports from outside North America represent a negligible portion of the market.

### iii.     Standardized Product with High Degree of Interchangeability

58.     The PFA recognizes polyurethane foam as a commodity, which is interchangeable across manufacturers.

59.     When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices.  This makes it easier to form and sustain an unlawful cartel.

### C.     Opportunities to Conspire

### i.     Inter-Company Hiring

60.     Defendants routinely hired high-level employees who formerly held strategic positions with their competitors.  Such inter-competitor hiring facilitated the opportunity for agreements between competitors.

61.     Examples of this inter-company hiring include, but are not limited to:

- The President of Vitafoam Canada was formerly employed by Woodbridge, serving as that company's Director of Corporate Engineering;

- A former vice president of Sales and Marketing at Vitafoam Canada was previously employed at Woodbridge.  He recently retired in March 2009, having worked in the polyurethane industry since 1963; and

- Jeff Carter, Plant Manager in Dallas/Ft. Worth at Future Foam, formerly was employed by Scottdel.

### ii.     Trade Associates and Industry Meetings

62.     Various industry trade organizations or events also facilitated Defendants' illegal conduct.  Representatives of Defendants have regularly met through such organizations as the

PFA, the International Sleep Products Association and Surfaces, a trade group which includes polyurethane carpet underlay producers. FPA members collectively represent 70% of total polyurethane foam production in the United States.

63. During trade association meetings held throughout the United States and abroad, Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

64. Not surprisingly, Defendants regularly announced polyurethane foam price increases around PFA's spring and fall meetings. For example:

- Defendants increased the price of polyurethane foam by as much as 35% in some product segments following the PFA meeting held on October 5 and 6, 2005 in Charleston, South Carolina; and

- As discussed further below, Defendants increased the price for carpet padding by as much as 15% following the PFA meeting held on May 26 and 27, 2010 in Baltimore, Maryland.

65. Other PFA meetings during the Class Period include, but are not limited to:

| Date | Location |
| --- | --- |
| October 17-18, 1996 | Scottsdale, Arizona |
| May 15-16, 1997 | Arlington, Virginia |
| October 9-10, 1997 | Orlando, Florida |
| May 14-15, 1998 | Arlington, Virginia |
| October 22-23, 1998 | Williamsburg, Virginia |
| May 13-14, 1999 | Arlington, Virginia |
| October 14-15, 1999 | San Diego, California |
| May 18-19, 2000 | Arlington, Virginia |
| October 12-13, 2000 | Newport, Rhode Island |
| May 10-11, 2001 | Arlington, Virginia |
| October 17-18, 2001 | New Orleans, Louisiana |
| May 8-9, 2002 | Arlington, Virginia |

| Date | Location |
| --- | --- |
| October 16-17, 2002 | Salt Lake City, Utah |
| May 7-8, 2003 | Arlington, Virginia |
| October 8-9, 2003 | Montreal, Quebec |
| May 5-6, 2004 | Washington, D.C. |
| October 20-21, 2004 | Albuquerque, New Mexico |
| May 4-5, 2005 | Washington, D.C. |
| October 5-6, 2005 | Charleston, South Carolina |
| May 3-4, 2006 | Washington, D.C. |
| October 11-12, 2006 | Santa Barbara, California |
| May 23-24, 2007 | Baltimore, Maryland |
| October 3-4, 2007 | Point Clear, Alabama |
| May 21-22, 2008 | Baltimore, Maryland |
| October 1-2, 2008 | San Antonio, Texas |
| May 20-21, 2009 | Baltimore, Maryland |
| November 4-5, 2009 | New Castle, New Hampshire |
| May 26-27, 2010 | Baltimore, Maryland |

D.    **Government Investigations**

66.    On or about July 27, 2010, it was publicly disclosed that the FBI, as part of a multi-jurisdictional investigation of polyurethane foam manufacturers, raided the offices of Carpenter and its competitors and seized documents and shuttered certain of Carpenter's offices.

67.    Carpenter confirmed the investigation, saying: "In connection with a multi-jurisdiction investigation of the pricing practices to [sic] polyurethane foam products, the U.S. government has required that manufacturers of polyurethane foam, including Carpenter Co., produce information and documents. Carpenter Co. is being fully responsive and cooperative with the government to facilitate their review."

68.     On or about that same day, the European Commission ("EC") raided the offices of several polyurethane foam manufacturers.  Carpenter was one of the targets of the EC raids as well.

69.     To obtain search warrants, as it appears that it did here against Carpenter and other Defendants, the United States must demonstrate to a magistrate judge probable cause, recounted in a sworn affidavit or testimony grounded on reasonably trustworthy information, that it would obtain evidence of an antitrust violation as a result of executing the search warrant. That is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations.

70.     The FBI and EC raids lend further support to the allegations of anticompetitive conduct in the market for polyurethane foam.

**E.      Defendant Vitafoam's Admission of a Conspiracy**

71.     In February 2010, Vitafoam voluntarily approached the U.S. Department of Justice's ("DOJ") Antitrust Division to self-report evidence of illegal antitrust activities among itself and other companies and individuals in the industry and to seek acceptance into the Antitrust Division's Corporate Leniency Program ("DOJ Corporate Leniency Program").  Since approaching the DOJ, Vitafoam and its employees have been cooperating with the government's investigation.

72.     As a result of its application, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division.  Under the DOJ Corporate Leniency Program, an applicant for leniency "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter."  Further, "A company that argues

that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency."[28]

73.     Also in February 2010, Vitafoam contemporaneously approached Canada's Competition Bureau ("Competition Bureau") seeking entry into the Competition Bureau's Immunity Program ("Immunity Program"). Similar to the DOJ Corporate Leniency Program, the Immunity Program grants immunity from prosecution under Canada's Competition Act to the first party that admits an offense has been committed and cooperates with the Competition Bureau.[29] Since approaching the Competition Bureau, Vitafoam and its employees have also been cooperating with Canadian authorities regarding the antitrust violations discussed herein.

## F.     The Conspiracy to Fix Prices and Allocate Customers

74.     Since approximately 1979, an understanding and agreement has existed among Defendants, competitors in the polyurethane foam industry, to fix prices for polyurethane foam products. During this time, Defendants established a practice whereby they would communicate and reach an agreement or understanding as to the percentage amount and timing of price increases in the sale and supply of polyurethane foam.

75.     As part of this understanding and agreement, Defendants further allocated markets by agreeing to avoid each other's customers and not attempt to take business or market share from one another.

---

[28] DOJ, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters* (Nov. 19, 2008), available at <http://www.usdoj.gov/atr/public/criminal/239583.pdf>.
[29] <http://www.competitionbureau.gc.ca/eic/site/cb-bc.nsf/eng/03248.html>

76.     The participants in this conspiracy took numerous steps to avoid detection of their conspiracy. This included maintaining "official" company policies that prohibited inter-competitor communications, despite the fact that Defendants knew, and wished, that these policies were openly and purposefully disregarded.

77.     Defendants also undertook efforts to police the conspiracy. For example, employees would follow up after discussions with competitors to see if the agreed-upon price increases and effective dates were, in fact, implemented.

78.     The impetus for the conspiratorial conduct was typically increases in raw material costs. Defendants utilize various chemicals, including polyols and toluene diisocyanate ("TDI"), in the manufacturing of polyurethane foam. When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, Defendants contacted each other. During the communications, Defendants discussed supporting specific price increases and the timing of announcements regarding an effective date of such increases.

79.     Defendants did not only raise prices when raw material costs increased; as discussed earlier, Defendants also initiated price increase discussions during the PFA's bi-annual association meetings, irrespective of current pricing conditions for polyols or TDI.

80.     During the Class Period, there was an understanding and agreement among the competitors in the foam industry to collectively support price increases. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases and how the conspirators would announce the increases with typically the same effective dates. Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.

81.    Exchanges of information between Defendants took place via fax, e-mail, telephone and face-to-face meetings.  Most exchanges of information occurred bilaterally and involved high-level executives.

### i.    Examples of Specific Persons Involved in Conspiratorial Communications

82.    Although likely representing a small portion of the total universe of individuals involved in the conspiracy, the following is a partial list of persons believed to have participated in price-fixing communications or, at the very least, to have served as conduits of information that enabled price-fixing to occur:

| Name | Company | Position |
|---|---|---|
| Bill Baughman | Plastomer | CEO |
| Bob Magee | Woodbridge | CEO |
| Bruce Schneider | Future Foam | CEO |
| Buster Mann | Hickory Springs | VP, Eastern Division |
| Dan Holsenbeck | Cerex | Sales Manager |
| Dan Temple | Carpenter | Head of Sales, Carpet Cushions |
| Dave Miller | Woodbridge | VP Technology |
| Dean Brayiannis | Valle Foam | Sales Manager |
| Don Phillips | Foamex | Exec. VP, Automotive Prods. Div. |
| Jerry Hightower | Bondtex | President |
| John Howard | Domfoam | President |
| John Vins | Ottobock Polyurethane | Sales Manager |
| John Weaver | Morbern Canada | VP Sales and Marketing |
| Jorge Canamero | CMI | President |
| Ken Miya | Inoac Corp. | Managing Director |
| Lee Lunsford | Hickory Springs | VP of Operations |
| Max Ozeki | Inoac USA | VP Foam Division |
| Mel Himel | Vitafoam Canada | President |
| Michel Legendre | Carpenter | |

Case 5:10-cv-00178-RLV   Document 1   Filed 11/15/10   Page 24 of 40

| Name | Company | Position |
|------|---------|----------|
| Mike Cotter | Inoac Corp. | Marketing Manager |
| Mike Crowell | Flexible Foam Products | VP Sales and Marketing |
| Paul McKay | Woodbridge | VP of Human Resources |
| Raj Mehta | Crest | President |
| Todd Councilman | Hickory Springs | Marketing - Sales Manager |
| Tony Vallecoccia | Valle Foam | President |
| Vinnie A. Bonaddio | Foamex | Senior VP, Technical Products Group |

### ii.    Examples of Coordinated Price Increases

83.    The existence of a conspiracy to fix prices for polyurethane foam is demonstrated not only by parallel price increases, but the timing and effective dates of those price increases. After Defendants had exchanged drafts of prospective price change letters and decided upon a specific increase, they would send letters to their customers informing them of the new pricing.

84.    Following is one example of such parallel pricing behavior from April-May of 2009 regarding carpet cushioning, one type of polyurethane foam product:

| Company | Date of Letter | Price Increase | Effective Date |
|---------|----------------|----------------|----------------|
| Flexible Foam Products | April 7, 2009 | 12 to 15% | May 15, 2009 |
| Mohawk | April 10, 2009 | 12% | May 18, 2009 |
| Carpenter | April 13, 2009 | 12% | May 18, 2009 |
| Vita Canada | April 14, 2009 | 12% | May 18, 2009 |
| Leggett & Platt | April 15, 2009 | 12% | May 18, 2009 |
| Future Foam | April 16, 2009 | 12% | May 18, 2009 |

85.    Not satisfied with the increase described above, certain Defendants instituted a second price increase almost immediately afterwards:

| Company | Date of Letter | Price Increase | Effective Date |
|---------|----------------|----------------|----------------|
| Mohawk | May 18, 2009 | 15% | June 22, 2009 |
| Flexible Foam Products | May 18, 2009 | 14% | June 22, 2009 |

| Company | Date of Letter | Price Increase | Effective Date |
|---|---|---|---|
| Carpenter | May 18, 2009 | 14% | June 22, 2009 |
| Future Foam | May 18, 2009 | 14% | June 22, 2009 |
| Leggett & Platt | May 18, 2009 | 14% | June 22, 2009 |
| Vita Canada | May 18, 2009 | 14% | June 22, 2009 |

### iii. Examples of Specific Communications Reflecting the Nature of the Conspiracy

86.     The conspiracy to fix prices and allocate markets described by Plaintiff herein covered the broad range of polyurethane foam products, from furniture and bedding to automotive and slabstock/polyurethane blocks.  For example:

- A Vitafoam employee, while he worked for his previous employer—another cartel member—spoke to Bill Lucas, a senior executive at Crest (part of Vitafoam U.S. at the time), to discuss price increases specifically for foam applications in the automotive industry.[30]  The employee noted that "all talks" he had with Lucas were primarily with respect to the **automotive sector**.

- On October 21, 2004, a Vitafoam employee sent an e-mail to his supervisor at his former employer where he said: "Lucas and I are talking about our favorite subject.  Jan 1 as a possible date."  This e-mail was a form of report to his supervisor regarding a price increase discussion for foam for the **automotive sector** with an effective date of January 1, 2005.

- On March 9, 2005, a Vitafoam employee sent an e-mail to his supervisor at his former employer with an update regarding a call from Lucas.  The Vitafoam employee wrote: "Spoke with Lucas again last week.  We are trying to meet in Chattanooga."  "We use the schedule discussions to lead into the real reason for the calls.  Said that they also were successful at the mills, in **Furniture** - they were still 'one' [price increase] behind."  Further in the same e-mail, the Vitafoam employee wrote that "I let him know we were going March 15th in Detroit [automotive sector].  He said they would probably wait until May 1.  Would have liked a more coordinated push."

- On September 14, 2005, in an e-mail thread, the head of a competing company wrote to a Vitafoam employee regarding pricing: "In separate conversation I talked to [Bill] Lucas [at Crest].  They are out with 11% on **blocks** nothing on **Auto**."  Later in the thread, the head of the competing company asked the Vitafoam employee to have one of his employees call Buster [Mann at Hickory

---

[30] Lucas is now retired.

Springs] today.  The employee wrote back "I called Buster yesterday.  We spoke about the **bedding** stuff.   It is at numbers we are not used to."

(Emphasis added.)

87.     Defendants' conspiracy covered not only a broad range of polyurethane products, but a broad geographical range spanning at least across the U.S. and Canada.  In fact, Canadian polyurethane foam price increases oftentimes followed immediately after similar price increases had been implemented in the U.S.  For example:

- On April 9, 2010, a Vitafoam employee received a telephone call from Bruce Schneider, CEO of Future Foam.  The same day, the Vitafoam employee called Schneider back.  Schneider had called to inform the Vitafoam employee that Future Foam, Foamex and Flexible, all U.S. foam manufacturers, intended to increase the price of foam by 20% in the coming weeks.  Schneider wanted to know Vitafoam Canada's intentions in this regard.  The Vitafoam employee responded that there was nothing happening in Canada at this time.

- On April 22, 2010, a Vitafoam employee called Bob Magee, CEO at Woodbridge, who told him that he heard that Foamex and Carpenter went with 20% price increase letters and asked if the Vitafoam employee heard about this.  The Vitafoam employee said yes, he had heard about it.  Magee then asked what was going on in Canada, and the Vitafoam employee responded that nothing was happening in Canada.  Magee was surprised that nothing was happening in Canada because Carpenter's Canadian companies typically get their orders from the U.S.

- On June 9, 2010, Dean Brayiannis, Sales Manager at Valle, called a Vitafoam Canada employee twice.  First he left a voicemail; on the second call, they spoke about an upcoming price increase that began in the U.S.:

  Brayiannis: Still haven't seen or heard of your increase letter yet.

  Vitafoam Employee: Well, have a look around.

  Brayiannis: I have.  Haven't found anything yet.  I've still got one guy telling me that you haven't issued a letter, so have you issued, yes or no?

  Vitafoam Employee: People will lie to you Dean.

  Brayiannis: I know.

  Vitafoam Employee: Looks like everything is moving forward.

Brayiannis: Are you around the same time frame as us? July 5th or what?

Vitafoam Employee: Yeah, close.

Brayiannis: Ok. And you haven't seen what, sorry? You haven't seen other increase letters or did you get all of those?

Vitafoam Employee: Well I know, I know that [other Vitafoam Canada employee] said that he'd seen the Mohawk one and I guess one of the other U.S. guys. You know everyone waits for the leader and once the leader goes out then everyone else follows cause we all know that the prices of material have gone up so, you know what I mean? That's how it goes. But yeah, if you listen to your customers everyone will be rolling prices back.

Brayiannis: Yeah. For sure.

Vitafoam Employee: Run your business.

Brayiannis: Huh?

Vitafoam Employee: Run your business. Don't let your customer run your business. Don't let them pretend they are going to run your business.

Brayiannis: Well at the end of the day over the last two increases we have chatted about it so just want to make sure you got your letter out.

Vitafoam Employee: Yeah. Ok pal.

Brayiannis: Have a good one.

- On June 15, 2010, Michel Legendre of Carpenter called a Vitafoam Canada employee to discuss a price increase and how Leggett in the U.S. planned to be the first to raise prices, with others following:

Legendre: Ok. So you ready for round 2?

Vitafoam Employee: You guys are going to go up again are you?

Legendre: Yep. Letter's going out tomorrow.

Vitafoam Employee: What date's on it?

Legendre: 19th of July.

Vitafoam Employee: How many points?

Legendre: 12.

> Vitafoam Employee: Yeah, I heard from the West already that something was coming though.
>
> Legendre: Yeah, they've gone up in the States, Legget went up. Legget's the one that's going up first this time in the U.S.
>
> Vitafoam Employee: And of course they got a hold of that and away we go. You know our position on it, we don't ... we're the tiny guys. We're the tiny guys. We just watch and see.
>
> Legendre: Yeah. You want a copy of it?
>
> Vitafoam Employee: Yeah if you want to send me a copy, you've got e-mail or a fax machine there right.

88.     As discussed above, Defendants used industry meetings such as the bi-annual PFA meetings to plan and discuss prospective coordinated price increases.  For example:

- On November 2, 2004, a current Vitafoam employee, while still working for his former employer, sent an e-mail to his supervisor and other superiors to say he "Met with [Bill] Lucas [of competitor Crest] at PFA."  The e-mail reports that Lucas said "most interested in their auto increases.  They will announce for Jan. 1" and "they would go +20%."

- On May 5, 2005, in an e-mail thread with subject "Vita," the former Vitafoam employee wrote that he discussed a price increase for May 2005 with Lucas at the PFA conference and later on with Raj Mehta (then Crest General Manager, now its President).

89.     Defendants also used telephone calls and emails to plan and discuss prospective coordinated price increases.  For example:

- In a June 2000 e-mail, a Vitafoam employee asked his salesman whether he spoke to Don Phillips of Foamex.  The salesman responded: "Yes, told him we are going out with our letter 12% effective July 30th; he said we would follow."

- On November 11, 2004, a Vitafoam employee sent an e-mail to his supervisor at his former employer with the subject header "Spoke to [Bill] Lucas [at competitor Crest]."  The e-mail states: "They are going to market probably next week.  Looking for a Jan. 1 effective date.  We're going at 18%."  The Vitafoam employee further wrote: "I said we would most likely be closer to 15%."  Lucas responded that he "[h]as not heard from Foamex" and "is going to try to call them again to see what number they will go with."

- On May 31, 2010, a Vitafoam salesman called another Vitafoam employee to relay that he had received a call from Michel Legendre at Carpenter, and Legendre said that the June 28, 2010 increase would be 11% and the price increase letter was out.

90. Defendants' conspiratorial communications were not limited to coordinated price increases. They allocated markets and customers by telephone and email, as well. For example, on May 20, 2010, John Howard, President of Domfoam, called a Vitafoam employee to lodge a complaint about one of his salesman's efforts to steal some of Domfoam's accounts:

Howard: The salesman in Montreal has been approaching Domfoam's accounts he has never sought before and selling at or quoting unusually low prices. I will give him the salesman a battle."

[Howard then tried to justify price quotes that Domfoam had given to two of Vitafoam's clients in the last six months, explaining that in both instances the client had actively sought the quote from Domfoam.]

Howard: A letter the Vitafoam salesman had sent to one of Domfoam's accounts was childish, and it looked it was written by a kid just out of business school. If the salesman wants a battle, I'll give him one. Domfoam will go after the salesman's accounts and both companies will end up hurting. The salesman is knocking on doors he has never knocked on before, which is pissing me and my sales guys off. He understands that business is bad and that the salesman is probably under pressure to get his numbers up, but he is going about it in the wrong way. His sales guys had been asking if he is going to do something about the situation or just let the Vitafoam salesman keep quoting low prices and taking business away.

[Howard asserted that he is ready to let the dogs loose and asked the Vitafoam employee to mull it over and get back to him.]

Vitafoam Employee: It is a bad time right now.

Howard: I do not expect an answer right now, but I would like to give my guys some indication that the dust will settle or tell them to do what they have to: go follow Vitafoam's delivery truck, find out who their customers are and start knocking on doors and do whatever the hell you have to do

[Several days later, the Vitafoam employee called Howard back and explained that another Vitafoam employee had been pretty hard on their salesmen. They then talked briefly about the letter the Vitafoam salesman sent, and they agreed that he should not say anything to the salesman about the letter. The Vitafoam

employee then explained that he had not spent a lot of time coaching and that he needs to spend more time coaching certain individuals.]

Howard: That is fine. Tell your salesman that Domfoam does not even know who Vitafoam's accounts are and they never interfered, but if he is going to continue quoting prices to guys who he does not currently sell to, we are going to go after his accounts. Business decision. Whatever way the chips fall that is the way they're gonna fall and life will go on. But the guys are asking me – you are always telling us to stay away. We did the same thing with Foamex, we don't go after their accounts, haven't for a while. Just kind of stayed away and they stayed away from our accounts too, so prices have been pretty stable. There ain't much business out there and by dropping prices only the customers are going to benefit. But let him [Vitafoam salesman] make his decision and if it is to continue going after them [Domfoam's accounts] then there will be some consequences. That's it. No big threats, but I can't not do anything. The sales guys are saying don't go here, don't go there, don't sell that one, don't go quote prices there; so sooner or later I have to tell them guys just go and do what you have to do.

[Vitafoam employee laughs and says OK].

Howard: Keep an eye on this guy, he needs coaching.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

91.    Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff and other Class members. These violations constitute injurious acts which restart the applicable statute of limitations

92.    Plaintiff and the Class did not discover, and could not have discovered through the exercise of reasonable and due diligence. Defendants' anticompetitive and conspiratorial conduct alleged herein, or the existence of the causes of action alleged herein, at any time prior to July 2010, when the government investigations were publicly revealed.

93.    Because Defendants did not disclose the existence or nature of their anticompetitive conduct to Plaintiff and the Class, and Plaintiff and other Class members could not have reasonably become aware of Defendants' unlawful conduct alleged herein at any time prior to July 2010. Before that date, Plaintiff and the Class did not, and could not have with the

exercise of reasonable diligence, become aware of the facts necessary to allege the causes of action alleged herein, including the fact that they were paying artificially high prices for polyurethane foam as a result of Defendants' conduct.

94.　Defendants' affirmative acts alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

95.　Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed by:

　　a.　meeting secretly (including use of private telephonic communications) to discuss prices, customers and markets of polyurethane foam sold in the United States and elsewhere;

　　b.　agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

　　c.　holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

　　d.　disguising price-fixing meetings and communications as technical and operational meetings.

96.　Because of such fraudulent concealment and the inherently self-concealing nature of the actions forming the conspiracy, Plaintiff could not have discovered the existence of the conspiracy, and the causes of action alleged herein, until after the government investigations described above were publicly revealed.

97.　Although Plaintiff exercised all reasonable and due diligence, Plaintiff had no knowledge of Defendants' unlawful self-concealing conspiracy, and could not have discovered Defendants' agreements and conspiracy, and the existence of the causes of action alleged herein at any time prior to July 2010, because of the deceptive practices and techniques of secrecy employed by Defendants' to avoid of, and fraudulently conceal, their agreements and conspiracy.

98.     None of the facts or information available to Plaintiff and the Class prior to July 2010, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy and anticompetitive conduct alleged herein prior to July 2010.

99.     As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff assert the tolling of the applicable statute of limitations affecting Plaintiff's right of action.  In addition, Defendants' illegal conspiratorial conduct, as alleged above, continues to the present day.

## ANTITRUST INJURY

100.    The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

a.     Prices charged by Defendants and their co-conspirators to Plaintiff and other Class members for polyurethane foam products were maintained at artificially high and supracompetitive levels;

b.     Plaintiff and other Class members were required to pay more for polyurethane foam than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c.     Plaintiff and other Class members have been deprived of the benefits of free, open and unrestricted competition in the market for polyurethane foam.

101.    During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiff and other Class members directly purchased polyurethane foam in the United States.

102.    Plaintiff and other Class members paid more for the polyurethane foam than they would have paid under conditions of free and open competition.

103.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and other Class members were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

104.    This is antitrust injury of the type that the federal laws were meant to punish and prevent.    As the direct victims of Defendants' antitrust violations, Plaintiff is an efficient enforcer of the antitrust claims made herein.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

106.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> All persons or entities which purchased polyurethane foam directly from Defendants or their co-conspirators from January 1, 1979 up to and including the date of class certification.  Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

107.    The precise number and identities of the Class members is known to Defendants but unknown to Plaintiff.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class numbers in the thousands.

108.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

109.    Class members are readily identifiable from information and records in Defendants' possession.

110.    There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include, but are not limited to:

> a.    whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States;

b.      the identities of the participants in the conspiracy;

c.      the duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

d.      whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.      whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other Class members;

f.      the appropriate nature of class-wide equitable relief;

g.      the effect of Defendants' conspiracy on the prices of polyurethane foam in the United States during the Class Period; and

h.      the appropriate measure of damages sustained by Plaintiff and other Class members.

111.    Plaintiff is a member of the proposed Class.  Plaintiff's claims are typical of the claims of other Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff bought polyurethane foam directly from one or more Defendants.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other Class members.  In addition, Plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

112.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

113.    The questions of law and fact common to Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

114.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

a.    it will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.    it would be virtually impossible for all Class members to intervene as plaintiffs in this action;

c.    it will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation to obtain redress for their economic injuries;

d.    the prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants; and

e.    it will provide court oversight of the claims process, once Defendants' liability is adjudicated.

115.    This class action presents no management difficulties that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

116.    The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of, the United States, in that, *inter alia*:

a.    Defendants and their co-conspirators have sold polyurethane foam throughout the United States;

b.    Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell polyurethane foam throughout the United States;

c.    in furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

d.    the conspiracy alleged herein has affected billions of dollars of commerce, and Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other entities who are themselves engaged in commerce.

## CLAIM FOR RELIEF
## For Violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act

117.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

118.    Defendants and their co-conspirators have entered into a continuing agreement, understanding and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

119.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

   a.    agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of polyurethane foam sold in the United States;

   b.    participating in meetings, conversations and communications with co-conspirators regarding prices to be charged for polyurethane foam;

   c.    agreeing to allocate customers;

   d.    meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

   e.    refraining from competing by refusing to offer polyurethane foam at prices below the agreed-upon fixed price.

120.    The combination and conspiracy alleged herein has had the following effects, among others:

   a.    price competition in the sale of polyurethane foam has been restrained, suppressed and/or eliminated;

   b.    prices for polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

   c.    those who purchased polyurethane foam from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

121. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam. Thus, Defendants and their co-conspirators shared a conscious commitment to a common scheme designed to achieve the unlawful objective of fixing prices and allocating markets for polyurethane foam.

122. As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiff and other Class members have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

123. The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PRAYER FOR **RELIEF**

WHEREFORE, Plaintiff prays the Court for relief as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed Class representative and that Plaintiff's counsel be appointed as counsel for the Class.

B. The Court adjudge and decree that Defendants' acts are illegal and unlawful, including that the agreement, contract, combination or conspiracy and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and other Class members for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees and pre- and post-judgment interest.

C. Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein.

D. The Court award Plaintiff and other Class members such other, further and different relief as may be necessary and appropriate.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

This the 15th day of November, 2010.


s/Martin L. White
Robert L. Burchette
Martin L. White
JOHNSTON ALLISON & HORD, P.A.
1065 East Morehead Street
Charlotte, NC 28204
Telephone: (704) 332-1181
Facsimile: (704) 376-1628
Email: rburchette@jahlaw.com;
mwhite@jahlaw.com

Manuel J. Dominguez
William B. Lewis
BERMAN DEVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
Email: jdominguez@bermandevalerio.com;
wlewis@bermandevalerio.com

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
Todd A. Seaver
Matthew W Ruan
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermandevalerio.com;
cheffelfinger@bermandevalerio.com,
tseaver@bermandevalerio.com;
mruan@bermandevalerio.com

Peter A. Pease
Nathaniel L. Orenstein
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: ppease@bermandevalerio.com;
norenstein@bermandevalerio.com

Tucker H. Byrd
MORGAN & MORGAN, P.A.
20 North Orange Avenue
Orlando, FL 32801
Telephone: (407) 420-1414
Facsimile: (407) 418-2048
Email: tbyrd@businesstrialgroup.com

Scott Wm. Weinstein
MORGAN & MORGAN, P.A.
12800 University Drive
Suite 600
Fort Myers, FL 33907
Telephone: (239) 433-6880
Facsimile: (239) 433-6836
Email: sweinstein@businesstrialgroup.com

Case 5:10-cv-00178-RLV   Document 1   Filed 11/15/10   Page 40 of 40